36

...
ABOUT B.BRAUN: At least a handful of meetings with their U.S. headquarters nave moved them close to affirming a strategic alliance with SIRA. A day or so of patent review is all that remains to come to a decision... wherein B. Braun secures a global license to market relevant SIRA products and perhaps create a partnership in a commercial component, call it BioVigilance and move toward an IPO for that unit....

Partners, the last opportunity to participate in the program whereby partnerhip contributions up to 250K in aggregate would secure 5% of SIRA stock have been spoken for. ...

In closing, we have provided the attached chart which reflects ...that our previous annual income forecast for transinformative barcodes was modest and made particularly so by substantial growth in distributed individual packaged foods....

To be sure, we anticipate sales from the European Union as early as mid 2006 followed closely in time with commerce from the breadth of venues where we also hold patents. In regard to those patents we are pleased to inform we met our recent quarterly maintenance fees and also paid down a fair portion of the substantial past-due account held by our patent attorneys.

The following gross income forecast reflects the proceeds from sales of transinformative thermal barcodes beginning 5/01/06 through 5/01/07. SIRA Annual Royalties @ $.015 per unit sold $211,687,500.00

92.   Upon information and belief: B. Braun never secured a global license to market any SIRA products; no IPO was ever offered for any SIRA unit If those actions did occur, the members/stakeholders/shareholders were never provided any

37

further information, nor repayment of any of their "investment", nor an accounting.

93.   On July 28, 2005, Jay Johnson and Margie Johnson were sent an email signed by "Bob" titled "Update, Miscellaneous" addressed to "CSPI Partners" from "Bob Goldsmith rgoldsmith@siratechnologies.com" . See attached Exhibit 31.

94.   The July 28, 2005 letter stated:

> [T]angible "highs" are ours to collectively embrace, albeit there are a handful of potential rock-bottom "lows", the latter being central to patent maintenance....
> [W]e recently traveled there to D.C. We remained there for two weeks visiting Congressional member offices representing states germane to SIRA's final-stage ink development,
> ....
> Included in this report is a support letter from our constant SIRA advocate, Congressman Eni Faleomavaega, sent to California Congressman Jerry Lewis, the Chairman of the Congressional Appropriations Committee.
> The letter, you will see, was copied to four Congressional members distilled from the many we visited, all of whom joined-on as funding advocates ...
> [O]ur best-educated time estimate to obtain federal funding would be October, and so it has come to be.
> ...
> Since Flint Ink had not yet offered SIRA a contract we were willing to be a party to, we would have no legitimate standing to apply for federal funds inasmuch as the greater portion of the funds are earmarked for Flint's conversion of URI pigments into ink suitable for successful printing press trials.
> As the contract negotiations continued, I decided to obtain a signed contract from Flint to legitimize the funding trip,

38

however, not one we would willingly execute. Therefore, we were able to go into D.C. with an expression of Flint intent, yet making full disclosure where merited that SunChem may replace Flint, if circumstances dictated.

....

Last week in California, two Flint Ink/Jetrion executives opened the continuation of contract negotiations with SIRA by announcing the Flint/BASF merger and thereafter, thankfully, behaved as seasoned statesmen asking for SIRA's hand in commerce punctuated with a willingness to concede to SIRA what before then was in their own words "non-negotiable" codicils and outright demands for SIRA concessions. A detailed agreement was reached and in our collective opinion (3 of us were there with our legal counsel) it is a good one. I will certainly execute it.

....

We will be presenting our technology and making the first public announcement of our new relationship with Flint at the International Association for Food Protection convention in Baltimore beginning August 13th. Several thousand participants will be there. ... Only one physical system for cold chain monitoring will be demonstrated — SIRA. In October, we will be doing a demonstration of our transinformative barcodes for the R&DA military annual meeting in Kentucky during the RFID plenary session. ... We have been contacted by an international group to present during their new Food and Livestock TraceabilityIn Dallas Texas Feb 1-2 2006 ... We have accepted the invitation.

The advanced manifestation of our barcode patents has been approved in the European Union. The newly approved patent language rises to global regulatory quality(extraordinary) and we may have as little as two weeks to pay for them, no more than three. If we do not pay on a timely basis, we lose the application entirely. Cost: 59,000 USD.

Our trademarks, due to patent regulations relevant to actual use in commerce, have expired. We must reapply

38

39

or actually forfeit them to anyone who applies. Cost: 29,000 USD.

95. On August 25, 2005, Jay Johnson and Margie Johnson were sent an email signed by "Bob" titled "Signed Contract with Flint and Other Happy Doings" addressed to "CSPI Partners" from "Bob Goldsmith, MGP rgoldsmith@siratechnologies.com" . See attached Exhibits 32 and 33.

96. The August 25, 2005 email stated:

> [W]ithin one day of executing the contract, a global packager and long-term Flint customer is pushing Flint in Ann Arbor for a license.
> .... [Additionally,] Ready cash and trademark language horse-trading enabled us to shave 12,000 USD from the law firm's germane dollar demand. Further dialogue, admittedly aggressive on our part, is focused on past SIRA complaints regarding less than adequate legal work and includes holding out a carrot to also reduce other overdue invoices for their immediate consideration related to an additional European Union patent. That process may result in no loss of intellectual property at a cash cost less than half now being demanded. I emphasize may, however, it is a rational may to relate. If it is doable within the mandatory patent process in the EU, the patent attorneys have agreed to do it and do it with adequate haste.

97. The signed contract referred to was between SIRA Technologies, Inc. and Jetrion, LLC. See attached Exhibit 32.

39

98.    Upon information and belief, no long-term Flint customer purchased a license from SIRA/CSPI. If that action did occur, the members/stakeholders/shareholders were never provided any further information, nor repayment of any of their "investment", nor an accounting.

99.    On April 25, 2006, Jay Johnson and Margie Johnson were sent an email signed by "Bob" titled "Interim bulletin toward full report coming 1st week May, 2006" addressed to "CSPI Partners"        from        "Bob        Goldsmith,        MGP rgoldsmith@siratechnologies.com" . See attached Exhibit 34.

100.  The April 25, 2006 bulletin stated

> I am the willing, zealous and fortunate participant in crafting and assembling three (3) substantial documents, that are:
> 1. An advanced business plan...
> 2. Secure agreed upon majority holdings in the outcome of an emerging scenario whereby SIRA merges with an east coast public company, becomes the solo name on the marquee", receives $250,000 in bridge funding and integrates with that company's principals to gain a listing on NASDAQ, and
> 3. The last submissions required to secure the federal funding which has been, at top command level, championed on to a fast-track...

101.  On the basis of those inducements, on November 29, 2006, Jay Johnson and Margie Johnson invested an additional $1,000.00.

41

102.  The "CSPI Investor Detail" sheet dated February 22, 2007
      reflected the Johnsons' additional investment of $1,000.00 on
      November 29, 2006, and the description section stated:
      "Contributed with special consideration (20X return) plus 1,000
      shares SIRA stock".  See attached Exhibit 35a.

103.  They were thus promised a return of $20,000 on their seventh
      investment of $1,000.00.

104.  Upon information and belief, SIRA did not merge with an east
      coast public company or gain a listing on the NASDAQ
      exchange.    If    those    actions    did    occur,    the
      members/stakeholders/shareholders were never provided any
      further information, nor repayment of any of their "investment",
      nor an accounting.

105.  The February 22, 2007 "CSPI Investor Detail" sheet also noted
      that the Johnsons' now held 59,660 shares of SIRA stock and
      had an estimated percentage ownership of 0.6485%.

106.  On January 24, 2007, Jay Johnson and Margie Johnson were
      sent an email signed by "Bob" titled "Partnership Meeting"
      addressed to "CSPI Partners" from "Bob Goldsmith, MGP
      rgoldsmith@siratechnologies.com" . See attached Exhibit 35.

107.  The January 24, 2007 letter stated:

> On February 24th at the Pasadena Hilton, please favor the general partners and our scientific, industrial and financial guest speakers with your presence. Our guests will speak to and demonstrate SIRA's progress…
> Please consider:
> 1. That the limited partners, within 30 days of the close of the meeting, will cast and transmit to our offices ballots provided them at the meeting for the purpose of establishing their affirmation or rejection as to whether SIRA Technologies will subsume California South Pacific Investors (CSPI). Rejection will maintain a status quo of operations, affirmation will provoke an orderly process of CSPI's dematerialization as it transfers all of SIRA's stock to SIRA wherefrom increments from a hefty pool of stock shares will emit to every limited partner commensurate with their individual financial contributions to CSPI/SIRA.
> 2. The limited partners within 30 days of the close of the meeting will cast and transmit to our offices ballots provided to them at the meeting as to whether they affirm or reject dissolving Hawaii Chemtect International (HCI). Should the limited partners assert their affirmation for dissolving HCI a tax write-off of approximately 5 million USD will inure to the partners, again, based upon each partner's contributions to CSPI/SIRA.
> Post Script:
> As a result of Cathy's brother suffering a terminal illness nearing its end and that Cathy and our webmaster are suffering the effects of that viral from hades making its rounds in California - our new temporary website will not be expanded to completion until mid-February.

108.  In September, 2007, Jay Johnson and Margie Johnson were sent a "CSPI Partners Report" in a bi-fold newsletter format,

43

signed by " Bob" with a column by Cathy Goldsmith. See

Exhibit 36.

109.  The September, 2007 column by Cathy Goldsmith stated:

> Welcome to my new column that will now appear in our partnership reports designed to keep you updated on our progress as the Ink Production Team moves toward the finalization of our government contract. Let me begin by re-acquainting you with the contract particulars.
> We secured Congressionally-directed Funding in the amount of $1,000,000, which was then forwarded to the Defense Logistics Agency, who in turn assigned the project to the Army's Natick Science Center for oversight. Chunks of the budget were lost to "managing agencies" along the way and we began the one-year contract in September 2006 with a budget of approximately $849,000. The contract calls for research to provide temperature-sensitive pigments and ink that will work to transform our barcodes.
> Temperature transitions were to be at 120°F, 80°F and 40°F. If possible, we would have a field test at a military facility.
> Our team consists of: Natick Project Director, Steve Moody; Brad Reddersen, Team Coordinator; Mitch Hartson, Military Logistics Coordinator; The University Science Team creating the pigments; and an Ink Production Facility to formulate the new inks and oversee the printing of sample labels. Oh, yes, add me to that as Project Administrator.
> … We have optimized a Generation 1, 40°F Pigment, and 10 grams of this pigment shipped to the ink manufacturer at the end of August. The next 80-90 grams will ship during the week of September 10th.
> … The 40°F ink should be completed by mid-September. We will then proceed with printing sample labels to develop some data measurement results. Testing will be carried out using the Stratix verifier we purchased, and data to be gathered will include reflectivity, edge

44

> characteristics, and depth of modulation between two narrow bars. Also in our print run will be actual readable dual barcodes.
>
> … After successful completion of our test labels, we will print labels to be affixed to packages at the San Diego Superstore (familiar to many as a PX). … The test is now scheduled for mid October or early November.

110. Upon information and belief, no benefit at all was realized by the members/stakeholders/shareholders, nor were they ever provided any further information, nor repayment of any of their "investment", nor an accounting, as a result of the $1,000,000.00 in federal funding supposedly received.

111. No products were built, sold or manufactured by SIRA/CSPI as a result of the $1,000,000.00 in federal funding supposedly received.

112. On November 8, 2007, Jay Johnson and Margie Johnson were sent an email signed by "Bob" titled "Miscellaneous" addressed to "CSPI Partners" from "Bob Goldsmith, MGP rgoldsmith@siratechnologies.com" . See attached Exhibit 37.

113. The November 8, 2007 letter stated:

> I wish to express ardent gratitude for the not uncommon kind words subsequent to our September 6, 2007 partners' report, As a result, our operational budget account has markedly expanded and will likely satisfy its projected needs through March 2008. Accordingly, our

45

recent offer to you to acquire bonus shares of SIRA stock for additional investments through CSPI is herewith withdrawn…

About 10 days back, I conversed with Rick Cartwright, a talk close on the heels of an email I sent to Rick expressing dialogue was required due to a decision made at SIRA, an outcome from which would either retire SIRA's interest in an alliance with Hobart or increase Hobart's presence in the FSS program.

… Hours after transmitting the email, I made a cold call to Wal-Mart…

Following the call to Wal-Mart, Rick Cartwright… left a meeting to chat with me. I informed him that it had become apparent to me that supermarkets would be best served by receiving their supplies of the FSS pre-activated, that IS to say no dual thermal stamper would be required for activation and all the meat department need do is auto-affix the FSS to their varied cold chain packages which would then go directly to the cold case in a continuance of monitoring for chilled or frozen packages by whatever thermal threshold is called for.

Therefore, if Hobart would agree to become the super converter to specifically and excuslively supply pre-activated FSS labels to the supermarkets, they would expand their economic opportunity In a strategic alliance with SIRA, and the absence of an agreement would retire all of our discussions, Rick hit about as many decibels as the human ear could tolerate with his affirmative response.

…Today I received the following e-mail from Wal-Mart… I frankly inquired that if the FSS passed muster would they, as is Wal-Mart custom, make it mandatory that all applicable merchants provide their product with the FSS applied. He responded affirmatively.

(By Cathy Goldsmith) At the time of our last report we were anticipating the ink to be formulated by mid-September. That did indeed happen on schedule and since then we have had several additional tweaked versions. …

46

> Our only slow down has been the amount of pigment the University can make at any given time.

114. Upon information and belief, no contracts were entered into with Hobart or Wal-Mart. If those actions did occur, the members/stakeholders/shareholders were never provided any further information, nor repayment of any of their "investment", nor an accounting.

115. On November 21, 2007, Robert Goldsmith sent an email to the other general partners, but not to the limited partners. See Exhibit 38.

116. The November 21, 2007 email stated:

> The confirmation of, and for, winding up and dissolution of the partnership is attached. It is faithful to every aspect of the process to enable the winding up and provides every partner with their earned value. Further, it effectively retires and shelters each general partner. And, consistent with our collective discourse regarding past general partner Duane Femrite, I will sign over Athanor's holdings in the partnership to Duane as is the will of his Athanor partners presented to me in writing.

117. The undated "Confirmation" was signed by Robert M. Goldsmith, Managing General Partner". It recited that a meeting of the CSPI Partnership was held on February 24, 2007 at which 218 voting entities were represented and 99% voted in favor of CSPI being wound up, with all of its assets and

47

liabilities being transferred to SIRA. The effective date was stated to be January 15, 2008. See Exhibit 39.

118. On March 12, 2008, Jay Johnson and Margie Johnson were sent an email signed by "Bob" titled "Activities, anticipated benchmark events and the status of our enterprise"" addressed to "SIRA Technologies Shareholders" from "Bob Goldsmith, MGP rgoldsmith@siratechnologies.com" . See attached Exhibit 40.

119. The March 12, 2008 letter stated that a partners' meeting was held on February 22, 2007 and:

> Since that meeting we have acquired approximately 780,000 USD in investment contributions and, so nice to report, that has retired economic matters once thought possible only through the acquisition of a costly bridge fund. Today our payables are current with every supplier and we retain a modest operational cushion. ...
> The official termination of CSPI will occur on March 31, 2008 and we are preparing 11.0 million shares for distribution. ... It is a truly good kick-off for the age of a stand-alone SIRA Technologies now enjoying a form of corporate celebrity that Wall Street refers to as bankable. ...
> Cathy, ... Doug Park, ... and myself, presented the FSS to 14 technologists from Wal-Mart and Sam's Club departments as diverse as food quality, transport, packaging, food processing,food safety, food defense and marketing....
> The University of Rhode Island has never succeeded in providing our ink chemists more than 50 grams of pigment a month. That sparse amount, a fraction of what

48

we contracted for, has hindered the chemists to the degree that less than optimum choices were forced upon them.... to date we have produced 2 thousand labels on standard presses, their barcode data is unfailingly modified and a slight improvement in kinetics is a bonus.

....

one pound of our ink will become part of 1.7 million FSS barcodes, each providing an average of 1.7 pennies in revenue. FYI, please be informed that pigments enable production of ink far greater in weight than themselves. In the U.S. alone our stringent data compilations point to a minimum 60 billion FSS configurations in our first full year of sales in the U.S. alone. When hypothecating the U.S. against the other venues where we hold patents, the arithmetic goes off the charts. Is that a realistic bon mot? Yes. We are projected to harvest — at a minimum — 25% of the smart label market that has professionally been forecast to rise to 8.8 billion USD in 2013, a year that our revenue is scheduled to reach 2.8 billion USD.

....

Candace Brown is no longer with us. The following is the text of Candace's resignation letter, a pro-forma document required in SIRA's policy language. "This letter is my formal two-week notice of my resignation from the position of controller at SIRA Technologies, Inc. My last day will be March 6, 2008. This was not an easy decision for me to come to, but I find the commute has become prohibitively long and my health is suffering as a result."
Replacing Candace is Josh Gustin who, like most everything for SIRA, came in a timely fashion we hardly would have imagined on day one. Some 30 resumes were generated on the first day of placing our employment notice on the net and from that collection we chose several, interviewed all and employed Josh on the spot. Josh has a year of forensic accounting in his vitae, he received his Bachelor's Degree from the University of Missouri in Kansas City, has had a year of Law School and is currently attending night classes at UCLA to acquire his CPA credentials, due to graduate in 2009.

49

120. On November 18, 2008, Jay Johnson and Margie Johnson were sent a letter signed by "Bob" titled "Update and Report" addressed "Dear Shareholders". See attached Exhibit 41.

121. The November 18, 2008 stated:

> For those of us contemplating an "insiders round" (IR)* of additional share acquisition @ one USD per, based on your percentage of the overall dollars already contributed — it will indeed happen. One million shares will be made available for the IR. Frankly, we have come to feel that the stock will, in a near time, be professionally appraised three to four times that amount, based on consistent recent cash acquisition and other calculating factors.
> ....
> In addition to constant in-house pigment dialogue during October/November — five of us: BG, CG, Brad Reddersen, and our two California Chemists traveled to Pittsburg to conference with a cadre of top flight organic chemists who themselves were also referenced in a previous update/report. After two days and one night there, we collectively realized that URI failed miserably to disclose the specific target utility of the ink thus leaving the Pittsburg Chemists to simply create material from a chemical formula given to them by the university. We immediately cut the chemists' tether to URI and struck an agreement to work directly with Pittsburg and look to URI only when necessary.
> ...
> In early February I will be in New York for a stay of approximately two weeks.... Those days will be confined to "angel investors"...
> Also, as reported by NY, they, the angels, seek a total of five (5) licenses to manufacture Food Sentinel Systems. Please be advised that SIRA now has mid-high six figure dollars at its disposal and likewise, please be advised it is set aside for the mass production of the Pittsburg ink to

49

respond to immediate needs and to fill the marketing/logistics pipe-line. The price tag for that necessity is $320k and the miniaturization and delivery of a technically advanced ink activator will cost $200k, a bit more — a bit less.

…To start — again, SIRA Technologies must have sufficient ink from the get-go to fill anticipated and committed orders from stocking distributors, converters and house accounts… About 10 days ago, label providers for Mickey D's and Krogers trained at 140 S. Lake at the direction of those marquis companies so as to assure them, through their label providers, that our product behaves as advertised…. A further cerebral undertaking is coming since our shareholders appear split in regard to an IPO or remaining a private company.

… "How will the shareholders make their voice heard?"… The projected time for that meeting is late March 2009.

… After Thanksgiving CG & I will be away and return three days before the office annually closes for the holidays enabling staff to enjoy their earned vacation time.

122.  Upon information and belief, no licenses to manufacture the Food Sentinel Systems were never sold, not the five mentioned above or any others. If those actions did occur, the members/stakeholders/shareholders were never provided any further information, nor repayment of any of their "investment", nor an accounting.

123.  Additionally, no shareholders meeting was held in March, 2009.

124.  On March 16, 2009, Jay Johnson and Margie Johnson were sent a letter titled "SIRA Update and the 'Insiders Stock

acquisition round'" addressed to "Dear Jay & Margie". See

attached Exhibit 42.

125. The March 16, 2009 letter stated:

> we are on the brink of exiting the development phase of
> the FSS and entering mass production...
> a past suitor who has often and aggressively contacted
> SIRA with acquisition of SIRA in mind, now —as a result
> of current worldwide publicity enjoyed by SIRA— wishes
> to discuss several forms of alliance. They have been an
> on-and-off-again potential strategic partner. An event I
> believe would greatly benefit us. At the moment they wish
> to buy as much ink as we would allow and now that
> royalty income has been incorporated into the price of the
> ink, there is much to recommend such transactions,...
> With the exception of a 3-day holiday weekend exodus of
> New Yorkers that bifurcated our 11 days there, it was
> early a.m. arrival at Crowell Moring (CM), meetings and
> lunch     in     one     of     a     dozen     compact
> conference/communication centers at 590 Madison Ave.
> Then, beginning at 4-5 p.m., a scramble for serious time,
> still at 590 Madison Ave, when funding entities came on
> the prowl as stock markets closed for the day. Prior to 4
> p.m. we coalesced with tightly scheduled individual
> investors 1-2 times a day at a minimum. Funding
> operations ran the gamut from individual fund mangers, to
> banks,   to   a   USDA   authorized   funding   agent,   to
> companies eternally in quest of attractive equity buy ins,
> partnerships and, in particular The Israel Credit Bank
> whose chief investing economist is a rotund scarletfaced
> Son of Erin.

126. The March 26, 2009 edition of the Profit and Loss Standard for

SIRA Technologies, (See Exhibit 43) stated that $196,805.91

52

was spent in 2008 on "Legal- Patent"; and $257,127.91 on "Salaries-Officers".

127.  On March 31, 2009, Jay Johnson and Margie Johnson were sent an email from "Bob Goldsmith" titled "Late, up to the Minute Reporting" to "SIRA Stakeholders". See attached Exhibit 44.

128.  The March 31, 2009 letter stated:

> In regard to calling for and then having a stakeholder meeting:  Our collective calendars indicate scant probability of a lessening of our always welcome duties. Yes, truly welcome, as honey to a bear. Our work is remarkably Pavlovian. The bell rings, we salivate and savor the reward for having created a one-of-a-kind, never Co be replicated, publicly beneficial product.
> So, try as we may, acquiring, at least, the perception of when best to announce a date for a shareholder meeting, our schedules defy instituting a meeting's usual month-long sedentary in-office preparation phase. Being busy is a virtue froth with opportunity and we trust you, as we, would have It no other way. But, please be assured that meeting planning is not a cadaver project. The instant it becomes doable, we shall conduct it live In Pasadena.

129.  No shareholders meeting was ever held in the year 2009.

130.  On July 15, 2009, Jay Johnson and Margie Johnson were sent a letter titled "Share Price Elevation" addressed "Hello 2 All". See attached Exhibit 46.

131.  The July 15, 2009 letter stated:

> Recognizing that outside inquiries to Invest in SIRA often reach us, that the stakeholders await and deserve an increase in share value, the SIRA Board of Directors has authorized and fixed the price per SIRA Technologies shares at seven (7) USD effective July 23, 2009. Recognizing that one (1) USD per share is no longer a viable, realistic or beneficial community process until 7-23-09, I ask that any stakeholder, for themselves or on behalf of a peer, contact me directly prior to July 23[rd]. As the desired quantity of shares sought is established, that will provoke the SIRA offering price.

132. Upon information and belief, no shareholders other than Robert Goldsmith and Cathy Goldsmith received any benefit from the July 15, 2009 letter, Exhibit 46.

133. On December 28, 2009, Jay Johnson and Margie Johnson were sent a seven-page letter addressed "Dear Shareholder" from "Josh Gustin, Shareholder & former controller of SIRA Technologies". See Exhibit 47.

134. Although there were many accusations and concerns expressed in the letter, the thrust of the letter was stated on the first page:

> What I can tell you is that Bob & Cathy have run up massive compensation liabilities with the company that they expect to be paid at some future date and have taken hundreds of thousands of dollars out of the company to fund an opulent, if not luxurious lifestyle. Bob & Cathy pay themselves overinflated salaries at a company that has no revenue stream and has taken over twenty years to get its product to market. Bob & Cathy

54

lack any sort of oversight or accountability to shareholders and have violated their ethical responsibilities as SIRA's management.
Through the fall of 2009, Bob & Cathy simply stopped showing up to work.

135. On January 4, 2010, Jay Johnson and Margie Johnson were sent an email titled "Gustin letter and his self-aggrandizing tutorial to the SIRA Technologies stakeholder community, becoming the penultimate metaphor for a disgruntled employee." addressed to "SIRA Stakeholders" from "Bob Goldsmith, rgoldsmith@siratechnologies.com" . See attached Exhibit 48.

136. In that January 4, 2010, email, Robert Goldsmith did not address each of Josh Gustin's accusations, nor did he apparently categorically deny any of them.

137. On January 11, 2010, the Johnsons, by their counsel, sent to Mr. Goldsmith a reply email inquiry, see attached Exhibit 49, to rgoldsmith@siratechnologies.com , stating, "Your email letter of January 4, 2010 is not at all helpful in determining whether or not Josh Gustin's claims are true, in fact, your letter makes his claims appear even more credible. We simply want to know, are some or all of his claims partially or entirely true? Please

55

respond with a simple "true" or "false" answer to the following claims he made." Josh Gustin's claims were then numbered 1 to 43, with a request that each be labeled either True or False.

138. As of this date, Mr. Goldsmith has completely failed to respond to that inquiry in any manner.

139. A SIRA shareholders meeting was scheduled to be held on January 30, 2010, the date having been scheduled the previous Fall. See Exhibit 50.

140. Robert Goldsmith unilaterally cancelled the January 30, 2010 shareholders meeting.

141. On January 28, 2010, Jay Johnson and Margie Johnson were sent an email titled "Miscellaneous: A MUST READ, very good, some bad, at times ugly" to "SIRA Shareholders" from "Bob Goldsmith". See attached Exhibit 51.

142. The January 28, 2010 email from "Bob Goldsmith" stated:

> I AM ILL! I never ducked an issue and the absence of a meeting date requires a "beg your pardon", not stone throwing. ...Please note that our attorneys are talking to Margit Arrobio who, along with Messers. Arrobio and Rich Young are the prime protagonists against SIRA, a property they covet and seek to acquire over my dead body.... The Arrobios and Rich Young want board seats and directorships. Only madmen and madwomen would begin to let their ilk within arms-length of our proprietary and valuable technology estate....

56

> Cathy and I have paid all bills, including patent
> maintenance through mid February — that undertaking
> required the last of the personal 50,000 USD we
> advanced to SIRA. ... Jeff Blatt and a few others will be
> here the first week of February to discuss funding. A
> wounded SIRA is not in a solid position to demand
> much.... Best bet all around is to sell 85% of SIRA for
> heavy immediate cash and distribute it based on
> individual shareholder percentages of SIRA.

143.  As mentioned above, Exhibit 46, the July 15, 2009 letter stated:

> Recognizing that outside inquiries to invest in SIRA often
> reach us, that the stakeholders await and deserve an
> increase in share value, the SIRA Board of Directors has
> authorized and fixed the price per SIRA Technologies
> shares at seven (7) USD effective July 23, 2009.
> Recognizing that one (1) USD per share is no longer a
> viable, realistic or beneficial community process until 7-
> 23-09, I ask that any stakeholder, for themselves or on
> behalf of a peer, contact me directly prior to July 23rd. As
> the desired quantity of shares sought is established, that
> will provoke the SIRA offering price.

144.  On February 18, 2010, Jay Johnson and Margie Johnson were

sent a letter titled "Critical Matters: All. And worse of all is that

the Barbarians have actually attempted to sell our top-of-the-

line ink to a competitor" to "SIRA Technologies Stakeholding

Community" from "Bob Goldsmith". See attached Exhibit 55.

145.  The February 18, 2010, letter stated:

> At the professional and wise direction of Crowell
> Moring in New York, an Insiders' Round for the benefit of

the less than financially blessed among us was instituted. It was fully subscribed at one USD per, the total amount of shares acquired in the Insider's Round was slightly above one million. ...

STAKEHOLDERS THAT WAS EARLY 2009 AND I SPENT HOUR AFTER HOUR, DAY AFTER DAY, FIELDING LINE DRIVE REQUESTS FOR EVER MORE ONE USD SHARES AND, OF COURSE, RELENTED. NONETHELESS THOSE THAT ACQUIRED THE BUCK A SHARE BECAME MISSIONARIES AND A NEW WAVE OF INITIALLY INTERESTED THEM STEADFAST SEEKERS OF A BUCK STOCK CAME A-KNOCKING. RELENTING BECAME A MANTRA, PARTICULARLY WHEN SHARE PRICE WAS INCREASED SUBSEQUENT TO THE INSIDER'S ROUND, MANY, AND IN THIS SCENARIO MANY IS A MILD ESTIMATE, OF OUR STAKEHOLDERS WHO HAVE, AS I, WOVEN THEMSELVES INTO THE FABRIC OF SIRA, CALLED DAILY TO QUERY IF, FOR ANY REASON, ONE BUCK SHARES FROM ANY SOURCE WERE AVAILABLE. SO PLEASE RECALL THAT THE 5% OF DISTRIBUTED SIRA STOCK I RECEIVED FOR TOO WAS RECEIVED AT AN EARLY TIME IN THE RESTRUCTURING OF SIRA THAT RELATIVELY EARLY THEREAFTER RETIRED ITS GENESIS RESTRICTED STATUS PROVIDED THAT ANY ONE WHO PURCHASED SUCH SHARES WOULD BE INFORMED IT WAS A SIRA OFFICER WHOSE SHARES WERE INVOLVED AND THAT THE PURCHASER WAS A QUALIFIED BUYER.

I CONSULTED WITH CROWELL MORING AND RECEIVED A GREEN LIGHT TO PERSONALLY ACCOMMODATE DESERVING SIRA LOYALISTS. STAKEHOLDERS WHO THEN CAME IN QUEST OF A BUCK A SHARE AND PIT THE PRESCRIBED CORWELL MORING CRITERIA, ACQUIRED SHARES NOT ONLY AT ONE U5D BUT MORE THAN OFTEN FOR AS LITTLE AS 50 CENTS,

(Capitalization in the original.)

146. The latest Share Certificate prepared for Jay Johnson and Margie Johnson on February 10, 2009, reveals that they own Seventy three thousand one hundred seven (73,107) shares in SIRA Technologies.

147. Robert Goldsmith frequently mentioned the need for additional shareholder/stakeholder/partner investments in order to protect the intellectual property interests of the shareholders, stakeholder, or partners, using such terms as "our two seminal trademarks, the SIRA cube and the name BioVigilance" (see, Exhibit 10).

148. The results of a United States Patent and Trademark Office Trademark Electronic Search conducted on February 5, 2010 (See attached Exhibit 53) reveals that a number of the trademarks have been abandoned:

   a. SIRA Technologies had a trademark and service mark application on "Infovigilance" which was abandoned on October 30, 2000 and is now considered a "dead" mark.

   b. SIRA Technologies had a trademark and service mark application on "Quantumvigilance" which was abandoned

59

on October 30, 2000 and is now considered a "dead" mark.

c. SIRA Technologies had a trademark application on the typed drawing "SIRA" which was abandoned on January 30, 2005 and is now considered a "dead" mark.

d. SIRA Technologies had a "design only" trademark application on what Robert Goldsmith has referred to as "the SIRA cube". The application says: "The mark consists of a partial cube on which the outline of an apple and a beaker are displayed." The application was abandoned on February 6, 2005 and is now considered a "dead" mark.

e. SIRA Technologies had a trademark application on the typed drawing "Biovigilance" which was abandoned on February 6, 2005 and is now considered a "dead" mark.

f. SIRA Technologies had a trademark application on the typed drawing "Food Sentinel System" which was abandoned on February 20, 2005 and is now considered a "dead" mark.

60

    g. SIRA Technologies had a trademark application on the trademark "Biovigilance" which was abandoned on March 2, 2006 and is now considered a "dead" mark.

149. The results of a United States Patent and Trademark Office Trademark Electronic Search conducted on February 5, 2010 (See attached Exhibit 54) also reveals that only a few of the trademarks have been continued:

    a. SIRA Technologies filed a trademark application for "Food Sentinel System" on February 1, 2005, it was given a number registration on March 29, 2009 and it is considered a "live" mark.

    b. SIRA Technologies filed an application on February 1, 2005, for a "design only" trademark application on what Robert Goldsmith has referred to as "the SIRA cube". The application says: "Color is not claimed as a feature of the mark. The mark consists of a partial cube on which the outline of an apple and a beaker are displayed." It was given a number registration on March 29, 2009 and it is considered a "live" mark.

61

    c. SIRA Technologies had a trademark application on the standard character mark "SIRA" which was filed on January 27, 2005, given a number registration on March 31, 2009, and it is considered a "live" mark.

150. Robert Goldsmith frequently mentioned the need for additional shareholder/stakeholder/partner investments in order to protect the intellectual property interests of the shareholders, stakeholder, or partners, using such terms as "our key patents" (see, Exhibit 16).

151. The results of a United States Patent and Trademark Office USPTO Patent Full Text and Image Database search conducted on February 5, 2010, using the search terms SIRA and Goldsmith, SIRA and California, and SIRA and Woodaman, reveals that California South Pacific Investors owns the following patents:

    a. On May 19, 1993 a patent application was filed for "A food contamination detector" by Robert M. Goldsmith. Patent No. 5,306,466 was granted for it on April 26, 1994

62

and the ownership of the patent was assigned to California South Pacific Investors.

b. Patent applications were filed on November 26, 1996, January 11, 1996, and March 31, 1998 for "A food contamination detector" by James G. Woodaman. Patent No. 5,869,341 was granted for it on February, 1999 and the ownership of the patent was assigned to California South Pacific Investors.

c. On July 12, 1999, a patent application was filed for "A food contamination detector" by Robert M. Goldsmith, Catherine H. Goldsmith, and James G. Woodaman. Patent No. 6,190,610 was granted for it on February 20, 2001 and the ownership of the patent was assigned to California South Pacific Investors.

d. On April 7, 1999, a patent application was filed for "The present invention [which] relates to a food contamination detector associated with a double bar code, given the trademark GILBAR.TM. by the owner of the present invention, that includes coded indicia used to identify the presence of conditions indicative of microbial

contamination in food, including toxic contaminants, bacterial metabolites, and other microbial secretions" by James G. Woodaman. Patent No. 6,270,724 was granted for it on August 7, 2001 and the ownership of the patent was assigned to California South Pacific Investors.

e. On July 24, 2000, a patent application was filed for "A dual bar code for detecting food contamination" by Robert M. Goldsmith, Catherine H. Goldsmith, and James G. Woodaman. Patent No. 6,479,016 was granted for it on November 12, 2002, and the ownership of the patent was assigned to California South Pacific Investors.

152. The results of a United States Patent and Trademark Office USPTO Patent Full Text and Image Database search conducted on February 5, 2010, using the search terms SIRA and Goldsmith, SIRA and California, and SIRA and Woodaman, reveals that SIRA Technologies, Inc. owns the following patents:

a. On February 11, 2003, a patent application was filed for "A dual bar code for detecting food contamination" by Robert M. Goldsmith, Catherine H. Goldsmith, and James

65

and Charles A. Arrobio by Luce, Forward, Hamilton & Scripps, LLP for a breach of contract with a demand for $176,400.00.

154. Robert M. Goldsmith, as Managing General Partner of California South Pacific Investors, and as president of SIRA Technologies, Inc., never revealed to the shareholders, stakeholder, or limited partners in those entities that a suit (Case No. GIC821503) had been filed on November 21, 2003 in the San Diego County Superior Court/ San Diego District against California South Pacific Investors, Robert M. Goldsmith, Duane L. Femrite, Willard Gayle Thompson, and Charles A. Arrobio by Luce, Forward, Hamilton & Scripps, LLP.

155. Robert M. Goldsmith, as Managing General Partner of California South Pacific Investors, and as president of SIRA Technologies, Inc., never revealed to the shareholders, stakeholder, or limited partners in those entities that a suit (Case No. GC 34864) had been filed on February 3, 2005 in the Los Angeles County Superior Court/ Pasadena District against California South Pacific Investors, Robert M. Goldsmith, Duane L. Femrite, and Willard Gayle Thompson by John Logan Hunter.

66

156. The February 18, 2010, letter titled "Critical Matters: All" from

"Bob Goldsmith", Exhibit 55, stated in part:

> The company I owned (TCIO) became pivotal to the
> partnership's imperative to bring SIRA Technologies into
> 3 freestanding enterprise. TCIO, CSPI and SIRA, through
> their certified governing management teams and
> attorneys executed impeccable joint resolutions to enable
> the desired process. TCIO, directed by CSPI & SIRA,
> obtained 100% of SIRA. TCIO, again through community
> fiat, allocated 95% of the SIRA shares back to SIRA. My
> distribution of shares, as a result of increased share
> distribution to each and every CSPI partner, topped off at
> 785,000 5IRA SHARES for years of sedulous R&D, the
> transfer of TCIO, trademarks, THE INVENTION OF THE
> BARCODE, the acquisition of the ink and collateral
> patents from URI and one million USD from Congress...
> and more.

157. In the February 18, 2010 document, Exhibit 55, Bob

Goldsmith", further stated (in capital letters):

> I CONSULTED WITH CROWELLL MORING AND
> RECEIVED A GREEN LIGHT TO PERSONALLY
> ACCOMMODATE DESERVING SIRA LOYALISTS.
> STAKEHOLDERS WHO THEN CAME IN QUEST OF A
> BUCK A SHARE AND PIT THE PRESCRIBED
> CORWELL MORING CRITERIA, ACQUIRED SHARES
> NOT ONLY AT ONE USD BUT MORE THAN OFTEN
> FOR AS LITTLE AS 50 CENTS.

158. Prior to that February 18, 2010 letter, Robert M. Goldsmith and

Catherine H. Goldsmith had never revealed that ownership

structure or transactions to the shareholders, stakeholder, or

limited partners in those entities.

159. Robert M. Goldsmith and Catherine H. Goldsmith owed fiduciary duties to Jay Johnson and Margie Johnson, and to all the SIRA shareholders, as a consequence of the positions the Goldsmiths held as Officers, Directors, managing partner and general partners.

160. Robert M. Goldsmith and Catherine H. Goldsmith breached their fiduciary duties to Jay Johnson and Margie Johnson.

161. In sum, Robert M. Goldsmith and Catherine H. Goldsmith promised Jay Johnson and Margie Johnson the following cash returns upon the monies given to Robert M. Goldsmith and Catherine H. Goldsmith:

    a. On 9/25/2001: $375,000.00 ($25,000.00 x 15);

    b. On 11/21/2002: $75,000.00 ($5,000.00 x 15);

    c. On 6/17/2003: $150,000.00 ($10,000.00 x 15);

    d. On 12/08/2003: $50,000.00 ($5,000.00 x 10);

    e. On 8/01/ 2004: $12,000.00 ($1,000.00 x 12);

    f. On 11/16/2004: $30,000.00 ($2,000.00 x 15);

    g. On 11/29/2006: $20,000.00 ($1,000.00 x 20);

    h. TOTAL PROMISED RETURNS: $712,000.00

162. Jay Johnson and Margie Johnson have received a ZERO return on the monies they paid to Robert Goldsmith and Catherine Goldsmith.

163. NONE of the promises or inducements made to Jay Johnson and Margie Johnson by Robert Goldsmith and Catherine Goldsmith have been kept.

## Count 1: Unjust Enrichment

164. The preceding paragraphs are incorporated herein by reference.

165. Jay Johnson and Margie Johnson are entitled to recover back their forty nine thousand dollars ($49,000.00) which they have invested, which ought not in justice to be kept by Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

166. Defendants Robert M. Goldsmith and Catherine H. Goldsmith received $49,000.00 of Jay Johnson's and Margie Johnson's money through imposition and by taking an undue advantage of them.

167. Defendants Robert M. Goldsmith and Catherine H. Goldsmith have in their hands money (which perhaps by now has been

converted to real or personal property) which, in equity and good conscience, belongs to Jay Johnson and Margie Johnson.

168. Defendants Robert M. Goldsmith and Catherine H. Goldsmith have thus enriched themselves unjustly at the expense of Jay Johnson and Margie Johnson.

## Count 2: Breach of Contract

169. The preceding paragraphs are incorporated herein by reference.

170. The December 2, 2002 signed letter on CSPI letterhead signed by "Robert M. Goldsmith, President" Exhibit 8, stated that: "Your contribution was given and received with an understanding and agreement to generate a 15-1 return when such monies are available."

171. The March 10, 2005 Partnership Memo, Exhibit 26, stated also that the standard promise was "an ear-marked 15-1 return when monies are available".

172. There thus existed a legally enforceable obligation between Defendants Robert M. Goldsmith and Catherine H. Goldsmith and Jay Johnson and Margie Johnson.

70

173. Defendants Robert M. Goldsmith and Catherine H. Goldsmith

    violated or breached that obligation.

174. The February 18, 2010, letter titled "Critical Matters: All" from

    "Bob Goldsmith", Exhibit 54, stated in part:

    > The company I owned (TCIO) became pivotal to the
    > partnership's imperative to bring SIRA Technologies into
    > 3 freestanding enterprise. TCIO, CSPI and SIRA, through
    > their certified governing management teams and
    > attorneys executed impeccable joint resolutions to enable
    > the desired process. TCIO, directed by CSPI & SIRA,
    > obtained 100% of SIRA. TCIO, again through community
    > fiat, allocated 95% of the SIRA shares back to SIRA. My
    > distribution of shares, as a result of increased share
    > distribution to each and every CSPI partner, topped off at
    > 785,000 5IRA SHARES for years of sedulous R&D, the
    > transfer of TCIO, trademarks, THE INVENTION OF THE
    > BARCODE, the acquisition of the ink and collateral
    > patents from URI and one million USD from Congress...
    > and more.

175. In the February 18, 2010 document, Exhibit 54, Bob

    Goldsmith", further stated (in capital letters):

    > I CONSULTED WITH CROWELLL MORING AND
    > RECEIVED A GREEN LIGHT TO PERSONALLY
    > ACCOMMODATE DESERVING SIRA LOYALISTS.
    > STAKEHOLDERS WHO THEN CAME IN QUEST OF A
    > BUCK A SHARE AND PIT THE PRESCRIBED
    > CORWELL MORING CRITERIA, ACQUIRED SHARES
    > NOT ONLY AT ONE USD BUT MORE THAN OFTEN
    > FOR AS LITTLE AS 50 CENTS.

176. It appears, therefore, that the money was available but that

    Defendants Robert M. Goldsmith and Catherine H. Goldsmith

took the available money for their own benefit rather than fulfill their promise to Jay Johnson and Margie Johnson.

177. Defendants Robert M. Goldsmith and Catherine H. Goldsmith injured and damaged Jay Johnson and Margie Johnson by the breach of obligation.

178. There thus existed a legally enforceable, valid and express contract between Defendants Robert M. Goldsmith and Catherine H. Goldsmith and Jay Johnson and Margie Johnson.

179. Defendants Robert M. Goldsmith and Catherine H. Goldsmith breached that contract.

180. Defendants Robert M. Goldsmith and Catherine H. Goldsmith should compensate Jay Johnson and Margie Johnson for all damages which fairly, reasonably and naturally arise in the ordinary course of things from that breach.

**Count 3: Common Law Fraud**

181. The preceding paragraphs are incorporated herein by reference.

182. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made many false representations preceding each inducement to "invest".

183. The false representations were regarding material facts.

184. The false facts which were stated and the true statements which were omitted were material because there was a substantial likelihood that a reasonable purchaser or seller of a security would have considered the fact(s) important in deciding whether to buy or sell the security, and/or would have viewed the total mix of information made available to be significantly altered by disclosure of the true facts.

185. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made the false representations intentionally and knowingly.

186. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made the false representation with intent to mislead.

187. Jay Johnson and Margie Johnson relied upon the false representations made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith

188. Jay Johnson and Margie Johnson were damaged by relying upon the false representations made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

189. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made willful, wanton and reckless material misrepresentations

73

or omissions of material facts to Jay Johnson and Margie Johnson.

190. Jay Johnson and Margie Johnson are entitled to actual, compensatory and punitive damages as a result of the willful, wanton and reckless misrepresentations by Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

**Count 4: Constructive Fraud**

191. The preceding paragraphs are incorporated herein by reference.

192. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made false representations.

193. The false representations were a material fact.

194. The false facts which were stated and the true statements which were omitted were material because there was a substantial likelihood that a reasonable purchaser or seller of a security would have considered the fact(s) important in deciding whether to buy or sell the security, and/or would have viewed the total mix of information made available to be significantly altered by disclosure of the true facts.

74

195.  Defendants Robert M. Goldsmith and Catherine H. Goldsmith made the false representation intentionally and knowingly.

196. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made the false representation with intent to mislead.

197. Jay Johnson and Margie Johnson relied upon the false representation made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

198. Jay Johnson and Margie Johnson were damaged by relying upon the false representation made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

### Count 5: Blue Sky Laws Violation

199. The preceding paragraphs are incorporated herein by reference.

200. In violation of the Code of Virginia § 13.1-502, Jay Johnson and Margie Johnson's investment was induced by the fraudulent misrepresentations and omissions of Defendants Robert M. Goldsmith and Catherine H. Goldsmith.

201. Defendants Robert M. Goldsmith and Catherine H. Goldsmith sold securities by means of untrue statements of material facts and omitted stating material facts which would have been

necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading.

202.  Jay Johnson and Margie Johnson did not know that the statements were untrue at the time they were made to them.

203.  The false facts which were stated and the true statements which were omitted were material because there was a substantial likelihood that a reasonable purchaser or seller of a security, would have considered the fact important in deciding whether to buy or sell the security, and/or would have viewed the total mix of information made available to be significantly altered by disclosure of the true facts.

204.  The Blue Sky Laws Violation under Virginia Code § 13.1-522(C) is usually constrained by the two year statute of limitations contained in Section 13.1-522(D).

205.  In this instance, however, the limitations period did not accrue until Jay Johnson and Margie Johnson had the fraud of Defendants Robert M. Goldsmith and Catherine H. Goldsmith revealed to them by the controller's letter of December 28, 2009.

76

206. Jay Johnson and Margie Johnson are entitled, under Virginia Code § 13.1-522 G, to bring this statutory action in addition to any and all other rights and remedies that may exist at law or in equity.

207. Jay Johnson and Margie Johnson are entitled to 6% interest, their costs, and their reasonable attorneys' fees.

**Count 6: Violation of the Virginia Consumer Protection Act**

208. The preceding paragraphs are incorporated herein by reference.

209. The offerings and sale to Jay Johnson and Margie Johnson of the membership shares or stock shares in CSPI and SIRA would be a "Consumer transaction" as defined by Virginia Consumer Protection Act at § 59.1-198, in that they were: "Transactions involving the advertisement, offer or sale to an individual of a business opportunity that requires both his expenditure of money or property and his personal services on a continuing basis and in which he has not been previously engaged".

210. Defendants Robert M. Goldsmith and Catherine H. Goldsmith violated Virginia Code § 59.1-200(A)(9) by "Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" of the membership or stock shares.

211. Defendants Robert M. Goldsmith and Catherine H. Goldsmith violated Virginia Code § 59.1-200(A)(14) by "Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction".

212. The violations of the Virginia Consumer Protection Act by Defendants Robert M. Goldsmith and Catherine H. Goldsmith were willful.

213. Pursuant to Virginia Code § 59.1-204.1, Jay Johnson and Margie Johnson's cause of action should normally be commenced within two years after their action accrued.

214. Virginia Code § 59.1-204.1 further states that, "The cause of action shall accrue as provided in § 8.01-230."

215. Virginia Code § 8.01-230 states, "In every action for which a limitation period is prescribed, the right of action shall be

deemed to accrue and the prescribed limitation period shall begin to run [as] otherwise provided under § ... 8.01-249".

216. Virginia Code   § 8.01-249 states: "The cause of action in the actions herein listed shall be deemed to accrue as follows: (1) In actions for fraud or mistake, in actions for violations of the Consumer Protection Act (§ 59.1-196 et seq.) based upon any misrepresentation, deception, or fraud, and in actions for rescission of contract for undue influence, when such fraud, mistake, misrepresentation, deception, or undue influence is discovered or by the exercise of due diligence reasonably should have been discovered".

217. In this instance, however, the limitations period accrued when Jay Johnson and Margie Johnson had the fraud of Defendants Robert M. Goldsmith and Catherine H. Goldsmith revealed to them by the controller's letter of December 28, 2009.

218. Pursuant to Virginia Code   § 59.1-204(A), Jay Johnson and Margie Johnson are thus entitled to receive triple their actual damages.

219. Their actual damages (but not necessarily their entire compensatory damages) are forty nine thousand dollars

($49,000.00). The triple amount would be one hundred forty seven thousand dollars ($147,000.00).

220. Pursuant to Virginia Code   § 59.1-204(B), Jay Johnson and Margie Johnson are also entitled to receive their attorney fees and costs.

**Count 7: Fraudulent Conveyance in Violation of Code § 55-80**

221. The preceding paragraphs are incorporated herein by reference.

222. Defendant Robert M. Goldsmith has consistently said that SIRA/CSPI does not have sufficient funds to operate or to pay its existing debts, and thus he is in effect stating that SIRA/CSPI is insolvent.

223. Existing creditors, purchasers or other persons, including Jay Johnson and Margie Johnson, were lawfully entitled to have access to the funds, stocks, and all other assets of SIRA and CSPI.

224. Defendants Robert M. Goldsmith and Catherine H. Goldsmith transferred funds, stocks, and other assets of SIRA and CSPI into their own control when there were creditors, purchasers or other persons who were lawfully entitled to those assets.

225. The transfers of funds, stocks, and real property made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith were made in violation Virginia Code § 55-80, *et seq*.

226. The transfers made by Defendants Robert M. Goldsmith and Catherine H. Goldsmith in violation of Virginia Code § 55-80, *et seq* are therefore void under Virginia Code § 55-80.

227. Pursuant to Virginia Code § 55-82.1, Jay Johnson and Margie Johnson are also entitled to receive their attorney fees and costs.

**Count 8: Unlawful Distributions in Violation of Code § 13.1-692**

228. The preceding paragraphs are incorporated herein by reference.

229. Defendants Robert M. Goldsmith and Catherine H. Goldsmith made unlawful distributions of business assets of SIRA and CSPI in violation of Virginia Code §§ 13.1-673 — 13.1-695.

230. Upon information and belief, in violation of Virginia Code §13.1-691.1, Defendants Robert M. Goldsmith and Catherine H. Goldsmith took advantage of business opportunities which should have first been offered to the corporation. Defendants

81

did not first bring those opportunities to the attention of the corporation before themselves becoming obligated for them.

231. Upon information and belief, in violation of Virginia Code §13.1-691, Defendants Robert M. Goldsmith and Catherine H. Goldsmith entered into transactions with SIRA in which they as director of the corporation had an interest that precluded them as directors from being disinterested directors.

232. Defendants Robert M. Goldsmith and Catherine H. Goldsmith are therefore personally liable, under Virginia Code §13.1-692, for their unlawful distributions of business assets of SIRA and CSPI.

## Count 8: Constructive Trust

233. The preceding paragraphs are incorporated herein by reference.

234. Defendant Robert M. Goldsmith has specifically and explicitly stated that he has gone on extended business trips with his wife, Defendant Catherine H. Goldsmith, when SIRA/CSPI received no benefit from that expenditure.

235. Upon information and belief, the controller of SIRA has alleged that Defendants Robert M. Goldsmith and Catherine H.

82

Goldsmith have maintained a lavish lifestyle and unearned compensation at the expense of SIRA in excess of that which had been authorized or appropriate.

236. To a very large extent, Defendant Robert M. Goldsmith has confirmed the controller's allegations.

237. The Court should impose a constructive trust on the funds and assets of SIRA/CSPI which had been used by Defendants Robert M. Goldsmith and Catherine H. Goldsmith for their personal benefit or the benefit of other entities they own(ed).

238. The constructive trust would be for the benefit of the creditors of SIRA/CSPI, including Jay Johnson and Margie Johnson.

WHEREFORE, Plaintiffs Jay Johnson and Margie Johnson pray that this Court would: impose a constructive trust on all assets wrongfully taken and used by Defendants Robert M. Goldsmith and Catherine H. Goldsmith; award Plaintiffs actual and compensatory damages from Defendants Robert M. Goldsmith and Catherine H. Goldsmith in the amount of seven hundred twelve thousand dollars ($712,000.00), and punitive damages, or with the damages trebled in accordance with Virginia Code 18.2-500, in an amount not to exceed

83

two million one hundred thirty-six thousand dollars ($2,136,000.00). In addition, Plaintiffs Jay Johnson and Margie Johnson pray that their attorney's fees be paid by the defendants under Virginia Code § 59.1-204(A) and § 55-82.1, plus pre-judgment and post-judgment interest and that Plaintiffs then be awarded their full costs and interest.

JAY JOHNSON,
MARGIE JOHNSON,
by Counsel.

J. Michael Sharman VSB #29651
Commonwealth Law Offices, P.C.
246 E. Davis Street, Suite 200
Culpeper, Virginia 22701
Voice 540-727-1007
Facsimile 540-727-7917

```
2001-10-01 ~ Ex 1 CSPI Investor Detail
2001-10-01 ~ Ex 2 SIRA receipt
2001-10-10 ~ Ex 3 Letter Confirming 15X return
2002-09-02 ~ Ex 4 Written Consent of Sole Shareholder of SIRA
2002-09-02 ~ Ex 5 Resolutions of the Board of Directors
2002-09-02 ~ Ex 6 Certificate of Restated and Amended Articles
2002-11-12 ~ Ex 7 Memo to CSPI partners on 15X again
2002-12-02 ~ Ex 8 Letter from Goldsmith Confirming 15X 5K
2003-01-13 ~ Ex 9 Memo to CSPI partners on $1.5 mil
2003-08-12 ~ Ex 10 CSPI Partner Memo Japan and patent
2003-10-13 ~ Ex 11 Memo to CSPI partners Arab Africa
2003-12-02 ~ Ex 12 Email Memo to CSPI partners variable return schedule
2003-12-15 ~ Ex 13 Dear Partner letter with bonus stock schedule
2003-12-15 ~ Ex 14 Letter with Bonus stock schedule
2004-04-13 ~ Ex 15 Email Annual Report & Financials
2004-05-13 ~ Ex 16 Email on Italian investor and patent maintenances fees
2004-07-27 ~ Ex 17 Update memo on Shipping Container system
2004-09-01 ~ Ex 18 Email on IPO and Italy
2004-10-14 ~ Ex 19 Memo with Income Projection
2004-11-11 ~ Ex 20 Memo about loss of patents
2004-11-17 ~ Ex 20a CSPI Investor Detail
2004-11-18 ~ Ex 21 All is well
2004-12-07 ~ Ex 22 Letter from Goldsmith on $2k investment
2004-12-15 ~ Ex 23 A Worthy Update
2005-01-20 ~ Ex 24 email Meeting with Flint rescheduled
2005-02-09 ~ Ex 25 Email 20K for patents
2005-03-10 ~ Ex 26 Partnership Memo
2005-04-13 ~ Ex 27 Flint Ink & Others
2005-04-13 ~ Ex 28 Proposal for Al-Dawliyah Marketing
2005-04-30 ~ Ex 29 Partnership Memo
2005-06-09 ~ Ex 30 Various Partnership memo
2005-07-28 ~ Ex 31 Update, Miscellaneous
2005-08-23 ~ Ex 32 SIRA contract w Flint
2005-08-25 ~ Ex 33 Email Signed Contract w Flint
2006-04-25 ~ Ex 34 Interim Bulletin
2007-01-24 ~ Ex 35 Partnership Meeting letter
2007-02-22 ~ Ex 35a CSPI Investor Detail
2007-09-00 ~ Ex 36 CSPI Partners Report
2007-11-08 ~ Ex 37 Miscellaneous Email from Goldsmith
2007-11-21 ~ Ex 38 Email from Goldsmith to other General partners
2007-11-21 ~ Ex 39 Confirmation of Winding up
2008-03-12 ~ Ex 40 Activities and benchmark events
2008-11-18 ~ Ex 41 Update and report
2009-02-10 ~ Ex 52 Share certificate
2009-03-12 ~ Ex 42 Incomplete letter on Insiders round
2009-03-26 ~ Ex 43 SIRA financials for 2008
2009-03-31 ~ Ex 44 Late reporting
2009-04-06 ~ Ex 45 Incomplete SIRA 2008 Annual Report
2009-07-15 ~ Ex 46 Share Price Elevation
2009-11-01 ~ Ex 50 Waiver of Notice of Shareholder Meeting
2009-12-28 ~ Ex 47 SIRA letter by Controller
2010-01-04 ~ Ex 48 Goldsmith Shareholder memo
2010-01-11 ~ Ex 49 True or False responses needed to Gustin's letter
2010-01-28 ~ Ex 51 A MUST READ email from Goldsmith
2010-02-05 ~ Ex 53 Trademark Electronic Search
2010-02-05 ~ Ex 54 USPTO Trademark Search pdf
2010-02-18 ~ Ex 55 And Worse of All
```